## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## ASHLAND

**CIVIL ACTION NO. 0:05-CV-32-HRW**

**In Re: HNRC Dissolution Company f/d/b/a**
**Horizon Natural Resources Company**

**LEXINGTON COAL COMPANY, LLC,**
**and TRAVELERS CASUALTY AND SURETY COMPANY**
**OF AMERICA,**                                                **APPELLANTS,**

**V.**

**MILLER, BUCKFIRE, LEWIS YING &**
**CO., LLC, and HNRC DISSOLUTION CO.,**            **APPELLEES.**

**And**

**AMERICAN SPECIALTY INSURANCE**
**COMPANY and the INSURANCE COMPANY**
**OF THE STATE OF PENNSYLVANIA,**                    **APPELLANTS,**

**V.**

**MILLER BUCKFIRE LEWIS YING &**
**CO., LLC, and HNRC DISSOLUTION CO.,**            **APPELLEES.**

### <u>MEMORANDUM OPINION AND ORDER</u>

The matter is before the Court on appeal from United States Bankruptcy

Court for the Eastern District of Kentucky, Judge William Howard presiding (Case

No. 02-14261). The subject of appeal is the Bankruptcy Court's Memorandum

Opinion ordering the payment of certain administrative fees pursuant to Appellee's

Fee Application. Appellee, Miller Buckfire Lewis & Ying (MBLY) served as investment banker for the Debtors, and the fee application sought compensation in the amount of $ 9.35 million as well as reimbursement of expenses in the amount of $173, 080.63. Objections were filed by Appellants as well as other parties not before this Court on appeal. The Bankruptcy Court heard argument on the fee application on November 19, 2004 and approved Appellee's application with some adjustments. This approval was memorialized in the Bankruptcy Court's Memorandum Opinion dated December 10, 2004.

The appeal has been fully briefed by the parties. Having considered the matter fully, and being otherwise sufficiently advised, the Court will affirm the decision of the Bankruptcy Court.

**I. Background**

On Feb. 9, 2004, the Debtors filed an application to retain Appellees as financial advisor and investment banker pursuant to sections 327(a) and 328(a) of the Bankruptcy Code (11 USC §§ 327, 328), nunc pro tunc to January 5, 2004. By an order entered March 2, 2004 ("the original retention order"), the Debtors' retention application was approved pursuant to the terms of an engagement letter dated Jan. 5, 2004 ("Engagement Letter") between the Debtors and the Appellees, and sections 327(a) and 328(a). An amended retention order was entered on March

2

16, 2004 ("first amended retention order"), and on July 12, 2004 the Debtors applied to amend the First Amended Retention Order so as to alter Appellee's compensation structure. Certain creditors filed objections to these proposed changes, and a hearing on the matter was conducted on August 6, 2004. At the August 6, 2004 hearing the Debtors, Appellees (MBLY), and the objecting creditors agreed on changes to the terms of MBLY's compensation. On August 30, 2004, the Bankruptcy Court entered an amended order ("second amended retention order") approving the revised fee arrangement. This order superceded all prior orders in regard to compensation.

The Engagement Letter, as modified and approved by the second amended retention order, specified the compensation MBLY would receive for the services it agreed to provide. The agreed compensation included: 1) a monthly financial advisory fee of $150,000.00 ("the monthly fee"); 2) a sale transaction fee ("sale transaction fee"), contingent upon the consummation of a sale (as defined in the Engagement Letter), and payable at closing, based on the aggregate consideration (as defined in the engagement letter), equal to the sum of 1.75% of the aggregate consideration up to $150 million, plus 1.25% of the aggregate consideration, if any, in excess of $150 million, subject to an overall Sale Transaction Fee cap of $8 million; and 3) the reimbursement of MBLY's actual and necessary expenses.

An auction for the Debtors' assets took place on October 1, 2004. Bids were permitted on all Debtors' assets ("Totalcoal"), all the assets designated in a stalking horse agreement ("Newcoal"), all the assets not included in the stalking horse agreement ("Oldcoal"), or individual assets of Newcoal and/or Oldcoal or any combination thereof. The Debtors completed the sale of substantially all of their assets to a consortium of purchasers ("Purchasers") after their bid for Totalcoal was determined to be the highest and best offer. The Purchasers paid approximately $875 million, including cash in the amount of up to $304 million, contributed debt ("the Credit Bid") in the amount of $482 million, and assumed liabilities in the amount of $89 million. Based on the formula set out above for calculating the Sale Transaction Fee, MBLY's fee request amounted to $8 million.

## II. The Bankruptcy Court Opinion

### a. The Credit Bid, Fees, and Section 328(a)

Upon submission of MBLY's fee request, the statutes in play before the Bankruptcy Court were sections 327 and 328 of the Bankruptcy code. Section 327 authorizes the retention of professionals with court approval. Section 328 provides that professionals employed under section 327 may be so on "any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a

contingent fee basis." 11 U.S.C. § 328(a). Once a court approves compensation under section 328, it cannot be altered unless the "terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of fixing such terms and conditions." This pre-approval takes the agreed upon compensation out of the realm of the usual "reasonableness" review under section 330. The Bankruptcy Court found that the terms of compensation had without question been pre-approved, and thus were subject to review only under the "improvident in light of developments not capable of being anticipated" standard.

The Bankruptcy Court next addressed the argument made by various parties that there were circumstances unanticipated and unknown at the time the fee structure was approved that later rendered it improvident and thus subject to modification under section 328. The court found that inasmuch as those arguments focused on the inclusion of the Credit Bid portion of the sale price in the fee calculation, neither the credit bidding itself nor its inclusion in the calculations were unanticipated.

First the Bankruptcy Court referred to its August 6, 2004 hearing in which it heard argument on the issue of whether credit bidding would be permitted as part of the sale. The court decided that it would permit credit bidding, as authorized by

Bankruptcy Code section 363(k). The court pointed out that during the same hearing it heard and ruled on modifications to the engagement agreement.  As such, the court stated that "it was contemplated that the value of the credit bid as well as the assumption of liabilities would be taken into account in determining MBLY's fee."

During the August 6, 2004 hearing the Bankruptcy Judge had asked what fees MBLY would be owed if credit bidding were permitted and one assumed that the second tier notes had a trading value of roughly 65% of their face value. The response was if credit bidding occurred under those circumstances, the fee could exceed $9 million. Following this discussion, the imposition of a cap was proposed, and the parties conferred and then reported to the court that they had agreed to an $8 million cap. The Bankruptcy Court's Fee Opinion used this to illustrate that not only was the inclusion of the Credit Bid in the fee calculations contemplated, it was agreed to by the parties. The court noted additionally that the Credit Bid had consistently been treated as part of the purchase price.  As such, the court found that there was no support for the argument that the terms of the engagement as approved by the court in August 2004 should be declared improvident.

Additionally, the Bankruptcy Court looked to the fact of a pre-auction

6

meeting among Debtors, creditors, and MBLY in which the ultimate Purchasers'
bid was reported. There, the full amount of the Purchaser's credit bid was used in
calculating the overbid that competing buyers would have needed to make.

MBLY contended, and the Bankruptcy Court agreed that the Credit Bid was
the same as if the Purchasers had paid that amount in cash and then immediately
reclaimed it through distributions on the second tier notes, or as though a third
party had made a bid with a matching cash component coupled with an agreement
to assume the Debtors' obligations under the second tier notes.  Additionally
MBLY effectively persuaded the Bankruptcy Court that the definition of
"Aggregate Consideration" included liabilities that were assumed "directly or
indirectly" as part of a sale, and that the Credit Bid amounted to an assumption of
the liabilities represented by the second tier notes, just as though a third party had
assumed those liabilities.

Finally, the Bankruptcy Court rejected the argument that the Credit Bid was
valueless. The very fact that the value of the Credit Bid was included in the
calculation of the aforementioned $8 million cap disposed of such a contention in
the mind of the court. The court pointed out that having such a cap in the first place
bears witness to the fact that all parties realized that MBLY would earn a very
large fee.

7

### b.  Reimbursement of Expenses

The Bankruptcy Court defined this issue as whether MBLY's expenses were reasonable. Under the Engagement Letter, MBLY was entitled to reimbusement for travel and other reasonable out-of-pocket expenses. MBLY asked the court to order reimbursement in the amount of $169,099.11. This amount included $69,891.32 for air travel, $22,196.20 for legal expenses, $15,028.70 for taxi and car services, and $9,116.47 for overtime meals.

The court first addressed the expenses for air travel. It first disallowed reimbursement for a private charter costing $21,742.00 which had been booked to assure both Mr. Buckfire's attendance at a hearing on bidding procedures and his timely arrival to board a cruise ship for vacation. The court did not believe "that the estate should bear the cost of assuring Mr. Buckfire's prompt arrival at his cruise departure."

The court next approved reimbursement for two other charter flights costing $11,227.05 and $10,876.01 which each carried eight passengers involved in the proceedings for the purposes of meetings with debtors. The court found the flights, while "not the most economical means of travel" were not unreasonable when broken down into a per person cost, and thus allowed these expenses. The court then denied reimbursement for a cancellation fee of $3,757.50, which it thought

excessive in the absence of any more explanation than MBLY had provided.

The court then turned to expenses for overtime meals and taxi and car service. The Bankruptcy Court first noted that these billings were made in accordance with MBLY's internal policy on expense reimbursement. The policy provided that professional and support staff staying at the office past 8:30 p.m. are entitled to a meal with a maximum allowance of $30. Professionals working on the weekends are entitled to a $10 lunch allowance, and professional staff working past 8:30 p.m. are entitled to transportation. Addressing questions of necessity of these expenses, the Bankruptcy Court noted that MBLY did not provide information that any of the professionals who worked on the case and billed these expenses were required to work overtime because the Debtors' business ran over a normal workday. The court observed the lack of information telling the court that these employees were not just choosing to work overtime because they could. Because of that, the court disallowed 50% of those expenses claimed.

With regard to legal expenses, the court noted that under the Engagement Letter, MBLY could seek reimbursement for charges of counsel, not to exceed $10,000 per month without Debtor approval. The court observed that MBLY did not provide any information as to the amount of time spent by counsel, the hourly rates charged, or the exact nature and dates of services performed. Nevertheless,

the court allowed the expenses as they were within the $10,000 per month cap.

The Bankruptcy Court entered an order allowing MBLY its fees in the amount of $9,350,000.00 and its expenses in the amount of $142,554.06. The Court then ordered payment of unpaid fees and expenses in the amount of $7,993,627.16.

### III. Standard of Review

The allowance of professional fees and expense reimbursements by a Bankruptcy Court is subject to review only for abuse of discretion. *In re Federated Dep't. Stores, Inc.,* 44 F.3d 1310, 1315 (6th Cir. 1995). The Bankruptcy Court's decisions in this regard cannot be disturbed absent a clear abuse of discretion or obvious mistake of law. *Calhoun v. Stratton,* 61 F.2d 302, 303 (6th Cir. 1932). The question is "not how the reviewing court would have ruled, but rather whether a reasonable person could agree with the bankruptcy court's decision..." *Barlow v. M.J. Waterman & Assoc., Inc.,* 227 F.3d 604, 608 (6th Cir. 2000). Put another way, "[a] court has abused its discretion if the reviewing court has a definite and firm conviction that the trial court committed a clear error of judgment in the conclusion that it reached based on all of the appropriate factors." *In re Hess,* 209 B.R. 79, 80 (B.A.P. 6th Cir. 1997)

In addition, if a contract is interpreted solely by reference to the language of

the agreement itself, then the Bankruptcy Court's interpretation of the contract is a matter of law that is subject to de novo review on appeal *In re Econ. Lodging Sys. Inc.,* 234 B.R. 691, 693 (B.A.P. 6th Cir. 1999). And as always, all findings of fact are reviewed only for clear error, and conclusions of law are reviewed de novo. 44 F.3d at 1315.

## IV. Analysis

### A. Inclusion of the Credit Bid in the Sale Transaction Fee

#### 1. The Credit Bid was properly included as aggregate consideration

Appellants argue that the employment agreement did not provide for the success fee to be based on the Credit Bid, and that even assuming it did, that would only be to the extent of its fair market value rather than face amount. Appellants then contend that the fair market value of the credit bid was de minimis and therefore the fee was not justified.

The employment agreement (engagement letter) provides that the sale transaction fee is based upon varying percentages of the aggregate consideration. Aggregate consideration is defined as the

> "total amount of cash and the fair market value of all securities and other property paid or payable, directly or indirectly, by the

11

acquiring party... (and)... shall also include the value of any **liabilities... assumed directly or indirectly** by the Acquiror in connection with a Sale." (Engagement Letter at P.5) (emphasis added).

The argument that the Credit Bid represented, directly or indirectly, an assumption of liabilities was presented to the Bankruptcy Court, and the Court agreed (*see* Memorandum Opinion, Doc. No. 5153, p.7). While Appellants have advanced various other arguments regarding what the Credit Bid was *not* (*i.e.,* that it was not "cash," "securities," or "other property,") they do not challenge the conception of the Credit Bid as assumed liabilities. This Court agrees with the Bankruptcy Court that the Credit Bid was in fact an assumed liability by the purchaser. As such, it fell squarely within the definition of aggregate consideration and was properly included in the fee calculation.

**2. The Credit Bid had value**

Credit bids are addressed under the Bankruptcy Code in section 363(k):

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of the property.

Clearly 11 USC §363(k) treats credit bids as a method of payment– the same as if the secured creditor has paid cash and then immediately reclaimed that cash in payment of the secured debt. In this case the Credit Bid was consistently treated as payment. The underlying security agreement upon which the Bankruptcy Court relied in approving the Credit Bid described it as a method of payment (*See* Bankr. Ct. Docket No. 3709 at 13-14). The Bankruptcy Court also treated it as a method of payment by entering an order that permitted the Purchasers to "credit against any portion of its bid which is in excess of the cash purchase price... all or a portion of the second tier notes," (Bankr. Ct. Docket No. 3780). All parties at the auction agreed to the inclusion of the full amount of the Credit Bid in calculating the purchase price that the Purchasers had agreed to pay and that a competing bid would have to exceed. (Bankr. Ct. Docket No. 3824). Finally, the Bankruptcy Court order approving the sale held that the "consideration to be provided by each Purchaser for the applicable Purchased Assets," which included not only cash but also credit bids and other assumed liabilities, "is fair and reasonable," and "constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United

13

States, any state, territory, possession, and the District of Columbia,"

(Bankr. Ct. Docket No. 4085, at 5-6).

Further, the legal authority cited by the Appellants might even be read to support this contention. Appellants rely on *In Re Lan Assoc.,* 237 B.R. 49, 192 F.3d 109 (3d Cir. 1999). In that case, the trustee had sold assets, part of the purchase price of which was credit bid. The trustee sought to include the amount of the credit bid in calculating the trustee fee. While the District Court rejected the contention that the credit bid could be treated as "moneys" that were "disbursed or turned over" by the trustee under 326(a), it did not question the fact that the credit bid constituted valuable "property" actually transferred. In affirming, the Court of Appeals did not question that an exchange of value had occurred and that property had been transferred when the credit bid was made. In this case, unlike *Lan Associates*, the fee calculation is not limited to "moneys" received by the Debtors, but expressly includes "property" that is paid and liabilities assumed "directly or indirectly," even if not a payment of "moneys" as interpreted by *Lan Associates.*

Additionally, the challenge to the Bankruptcy Court's factual determination as to the value of the property is without merit (and

14

Appellants have not actually contended that this was clearly erroneous) in light of the evidence of "value" that was before the court. For instance, there was evidence that the second tier note were trading at 65% of face value at the time credit bidding was approved (and trading at over 100% face value at the time the sale was approved). In addition, the parties themselves had consistently treated the Credit Bid as a legitimate part of the $875 million purchase price. There was also evidence that the purchase price did not merely include the Credit Bid but also included cash that was in excess of the amount needed to pay senior claims, the logic being:

> since the Purchasers had the right to make a "Credit Bid" with respect to the assets and had no obligation to pay junior obligations, the payment of such additional cash (and the payment of such junior obligations) demonstrated that the value of the purchased assets exceeded the amounts of secured claims and therefore the full amount of the Credit Bid had value.

There was clearly sufficient evidence before the Bankruptcy Court indicating the value of the credit bid, and this Court finds that the Bankruptcy Judge's ruling in this regard was correct.

**B. The other assumed liabilities**

Appellants complain that the $89 million in additional assumed liabilities should not have been included in the calculation of the fee because

MBLY provided no breakdown or itemization in support. Appellants claim that the Bankruptcy Court erroneously failed to reduce MBLY's fee based on this. Appellants' argument, however, fails to recognize that if the Credit Bid is properly included for purposes of calculating the fee, then the fee easily reaches the $8 million cap.

In light of the proper inclusion of the Credit Bid as aggregate consideration with value, this Court finds that the Bankruptcy Court properly determined that it was unnecessary to resolve issues relating the inclusion of other assumed liabilities. That is, there was no need to consider Appellants' argument on this matter because the fee would have been above the $8 million cap regardless of the allowance or disallowance of these other assumed liabilities in calculation.

## C. The standard for modification and review under 11 U.S.C. § 328

Notwithstanding a finding that the fee structure allowed for inclusion of a Credit Bid, Appellants claim it was not anticipated that the vast majority of the sale transaction fee would be based on the Credit Bid (over $6 million).     Accordingly, Appellants urge that the fee should be modified under section 328(a) of the Bankruptcy Code.

16

Section 328(a) provides that once the terms of a professional's compensation have been pre-approved by the court under 328, those pre-approved terms cannot be altered unless they "prove to have been improvident in light of developments not capable of being anticipated at the time of fixing of such terms and conditions." This discretion exists only when events have occurred that were not capable of being anticipated at the time the compensation terms were approved. *In re Merry Go Round Enter.,* 244 B.R. 327, 337-38 (Bankr. D. Md. 2000). *See also In re Barron*, 325 F.3d 690, 693-94 (5th Cir. 2003) (court could not modify contingent fee arrangement unless developments were "not capable of being anticipated"; mere fact that parties had not expected a settlement was not enough, because a settlement could have been anticipated); *In re Ross*, 94 B.R. 210, 216 (N.D. Ga. 1988)(contingent fee could not be re-examined for reasonableness and could not be denied in the absence of a showing that it was improvident due to circumstances that were "not capable of being anticipated").

Even where such unforeseeable circumstances are present, the Bankruptcy Court in any event is not ***required*** to deviate. Section 328 uses the word "may" to express that deviation in the face of circumstances not capable of anticipation is permissive but not mandatory in any case. *And see*

*In re Begun,* 162 B.R. 168 (Bkrtcy. N.D. Ill. 1993)(holding that 328(a)'s mechanism for modification where improvident is permissive, not mandatory).

Appellants claim there were two major unforeseeable events here. They first contend that the inclusion of the credit bid in the calculation of the Sale Transaction Fee. Such a claim appears disingenuous in the face of all the evidence to the contrary that was before the Bankruptcy Court, namely that this very issue had been discussed in open court and was used to calculate a fee cap.

On August 6, 2004, the Bankruptcy Court heard argument on the issue of whether credit bidding would be allowed as part of the sale of the debtors' assets. The Court decided that it would be permitted. Also discussed and ruled upon at this August 6 hearing were modifications to MBLY's engagement. During this hearing, fee calculation which included the credit bid was contemplated and discussed in open court.

The Bankruptcy Court then asked what fees MBLY would earn if credit bidding occurred and one assumed that second tier notes had a trading value roughly equal to 65% of their face value. The court was informed that if credit bidding occurred under those circumstances MBLY's fee could

18

exceed $9 million. It was at that point the imposition of a cap was suggested– which the parties later agreed to an $8 million cap. The Bankruptcy Court then approved the amendment to MBLY's engagement and incorporated the parties' requested terms, including the $8 million cap.

The fact that the credit bid's inclusion in the fee calculation was contemplated, discussed in open court, and a motivating factor in the imposition of a cap, precludes any sincere argument by Appellants that the same was unforeseeable.

The second set of "intervening circumstances" that Appellants claim were unforeseeable includes the concessions made by various parties in order to successfully resolve issues surrounding the Debtors' Chapter 11 cases. Appellants state that "the sale could not have taken place without the Appellants, the Regulatory Authorities, and other parties expending considerable efforts and making significant concessions to craft the Reclamation Agreement..." (Apellant Brief, at 17).

Appellants surely cannot expect this Court to buy the premise that it is not capable of anticipation that various parties to a sale of debtor assets under Chapter 11 may have to make concessions in order to effectuate the transaction. That is simply untenable. Appellants argument seems to suggest

19

that the sale of the assets occurred with more efforts on the part of the creditors than they expected to have to make. The Court notes, however, that Appellants do not contend that MBLY failed to perform any one specific function required in the engagement letter. They do not point to any specific evidence that would suggest MBLY did not fulfill its obligations under the engagement letter. To simply say, "we didn't think we would have to make so many concessions," does not rise to the level of a circumstance that is not capable of being anticipated and certainly does not provide the legal justification required by the statute for an after the fact change of the fee structure.

One additional point on this issue is worthy of observation. Appellants complain that if the terms of the fee arrangement are enforced, MBLY will earn the equivalent of $2,400 per hour for its services. Appellants call this "outrageous" and argue that such a fee should not be paid "at the expense of funding the significant reclamation and other environmental work that Lexington Coal must perform." Such argument is tantamount to asking the Court to reduce the fee based on the interests of conservation of the estate. Appellants reiterate in the conclusion to their brief that by refusing to change the terms of the fee structure, the Bankruptcy Court removed "millions of

20

dollars from the estate that could have gone toward essential reclamation activities, and (gave) them instead as an unearned windfall."

Not only are Appellants complaints hyperbolic and unpersuasive, they cannot be supported by any stretch of the law or the facts. In the first part, there is no "unearned windfall" here, where the terms of this fee structure were negotiated at arm's length by sophisticated parties, approved by the Bankruptcy Court under the authority granted by section 328, and unaffected by any circumstances that Appellants would have the court believe were unforeseeable. There is no windfall here, there is simply the need to protect the professional's expectation of compensation and ensure that the most highly qualified professionals remain willing to participate in the bankruptcy process. Further, Appellants' claim that millions of dollars will be removed from the estate provides absolutely no justification whatsoever for changing the pre-approved terms of MBLY's fee. *See generally, In re Nucorp Energy, Inc.,* 764 F.2d 655, 658 (9th Cir. 1985). The only escape hatch from the pre-approved fee is via the narrow requirements of section 328(a) improvidence. Those requirements have not been met.

**D. Reimbursement of expenses**

Under the employment agreement, reimbursement of expenses are

committed to the discretion of the Bankruptcy Court. The engagement letter provides for reimbursement of "reasonable out of pocket expenses." It also provides that such "reimbursement shall be made promptly upon submission by MBLY of statements for such expenses, subject to Bankruptcy Court approval." The agreement does not, however, indicate how detailed such statements must be. The engagement letter does not even specifically state that insufficient documentation is grounds for denial of expenses. That being the only language in the contract referring to statements, it could be read to merely specify the time and manner of performance of the obligation to reimburse rather than imposing a condition precedent to reimbursement. It seems clear that the sufficiency of the supporting documentation is within the discretion of the Bankruptcy Court.

The Appellants complain that the Bankruptcy Court erroneously awarded reimbursement despite the inadequacy of the statements for the expenses. However, the record contained over 60 pages of detailed statements covering the expense categories for which reimbursement was sought. The Bankruptcy Court did not simply 'rubber stamp' all of the expenses for which MBLY sought reimbursement. The record reveals that, to the contrary, the Bankruptcy Court assessed each individual category of

22

expenses for reasonableness and sufficiency of documentation. In fact, nearly $27,000 worth of expenses were disallowed as unreasonable. There is no evidence that the Bankruptcy Court simply "set aside" the Employment Agreement as the Appellants allege. As such, the Court finds that the Bankruptcy Court properly exercised its discretion in awarding the reimbursement of expenses.

## V. Conclusion

For the foregoing reasons, the Court finds that the Bankruptcy Court's Order requiring the payment of fees is correct, and accordingly, the Court will AFFIRM the Bankruptcy Court's Opinion and DISMISS the appeal [Docket No. 1] A separate judgment shall issue this day in conformity with the Memorandum Opinion.

This March 22, 2006.



**Signed By:**

_Henry R Wilhoit Jr._

**United States District Judge**